The next case on the docket is agenda number 18, number 128841. Charles Muhammad et al. v. Abbott Laboratories, Inc. et al. Counsel for Appellant, are you prepared to proceed? Yes, ma'am. May it please the Court, my name is Joel Bertocchi and I represent the defendants and appellants in this case. In this case, two treating doctors testified in an unqualified way that a different warning posited by the plaintiffs would not have changed their decision to prescribe the drug Depakote I keep calling it Deepcoat but I'm not sure which one it is to Mrs. Muhammad and they had a very specific reason because they believed that they could keep her from getting pregnant due to the birth control patch that she was wearing that would be effective and that they could monitor. The First District held the contrary that that unequivocal testimony was placed in dispute for purposes of summary judgment by an affidavit from a doctor who couldn't pick Mrs. Muhammad out of the lineup, never treated her and he didn't say that it didn't happen. His affidavit said it was unreasonable for the doctors to do that. And when we pointed out to the First District that it was relying on, that the plaintiff was relying on medical malpractice cases where that kind of expert opinion is common, the response was it makes no difference, does not matter. But I submit to the Court that it makes a great deal of difference and I want to focus in my remarks at the moment on three ways that it makes a difference. Three differences between a medical malpractice case and a product liability failure to warn case where the learned intermediary rule enacted by this Court in Kirk and never questioned since then has been applied. One is that the two causes of action stem from different duties on the part of the defendants. In a medical malpractice case, you're dealing with the duty of a particular doctor treating a particular patient based on that patient's medical history and symptoms and all the things that a doctor uses to decide how to treat the patient. In cases like that, it is not surprising that you would need expert testimony, and I'll get to that. But in a product liability failure to warn case, you cannot and no one expects a drug manufacturer to have that kind of relationship with or knowledge of any particular patient. Drug manufacturers have to rely on doctors to act in a reasonable way in using their medication. So in that sense, the duties underlying the two causes of action are very different. There are different kinds of cases also. A medical malpractice case, in any malpractice, accounting malpractice, all the other kinds of malpractice, are all about placing conduct within a reasonable range. Did the doctor, did the accountant, did whoever is supposed to have committed the malpractice act in a reasonable way professionally, within the professional technical standards of what they do? In medical malpractice cases, a doctor is necessary. A jury is not going to know what the reasonable standards of care are unless you have juries full of doctors, which would be a disaster. Counsel, I have a question. So in an instance where the testimony by the doctors who treated the patient is determined or there's an allegation that it's incredible that they would not have changed their opinion, what is the recourse if, you know, you want to challenge that? Your Honor, there are lots of ways to dispute witnesses' testimony, and doctors are no different. You can cross-examine them. You can look at other cases that they've been involved in. You can dispute doctor testimony about what they would have done in the same way you could dispute the testimony of any witness in terms of what they would have done. But what you can't, what doesn't dispute it, and I will come to this in more detail, what doesn't dispute a doctor saying this was my course of action, I would not have changed it based on that. What does not dispute it is somebody saying that's unreasonable. And I want to get to that in order if that's okay. There are different kinds of cases, medical malpractice cases and failure to warn cases. A medical malpractice case, as I said, is about whether the doctor's conduct was reasonable, whether it fell within a range of acceptable conduct in that profession. A products liability failure to warn case is about what was actually in the doctor's head. It's kind of a what happened and what would have happened case. That is not whether the doctor would have changed their behavior had they been provided with something different. The third difference I want to focus on between the two causes of action is the different way experts are used in the two kinds of cases. We all know that in a medical malpractice case you need an expert to testify both as to whether the doctor's conduct was reasonable and whether it caused the injury. That's very familiar. But in a products liability failure to warn case, the jury doesn't need an expert to judge the testimony of the doctor as to whether, yes, you really wouldn't have changed your mind. It's testimony about it by an individual about their intent, about their state of mind. Juries evaluate that all the time. I'm sorry. Doesn't that lead back to the question that Justice Holder White raised? Is this a jury question, then? Medicaid jurors do this all the time. Why is this summary judgment? It's a jury question if you produce facts to dispute it. And the plaintiff did not do that in this case by stapling to the back of their summary judgment response an affidavit from a doctor who said what that guy said is unreasonable. And that kind of is the nub of this case. Isn't that really the nub of this case is that their expert would say that this would fall so far below the standard of care that a doctor would not do that and continue to believe he's going to or she's going to halt their medical license? Well, Your Honor, remember the doctors in this case made a plan, and the plan has apparently been judged, some part of it has been judged not reasonable in a different case. But to me, that cuts off proximate cause for the drug company. But what it really is about is whether, in a medical malpractice case, if the doctor says that course of action is reasonable, that's the result determinative question. But what the nub of the case really is, is if a person says this was my course of action, and someone else says, okay, but that's unreasonable, that's not a judgment of the course of action, does it make it less likely that it actually happened? Are people unlikely to do unreasonable things? And I submit to the court that if you're going to hold that, you're going to be lowering the bar in summary judgment in this and other kinds of cases substantially, because anybody can find an affidavit from somebody or obtain one that says what that guy says he did is unreasonable. But it really doesn't dispute whether it happened, and that's the key. That goes back to the difference between the two kinds of cases. An expert in a medical malpractice case is testifying, the doctor's testimony was unreasonable, the doctor's course of action was unreasonable, that's the issue. But in this case, the question is, did the doctors really think that? Would they really not have changed their mind? Maybe this case is not a product liability case at all. Maybe this case is just a what is the standard of the summary judgment kind of case. Well, okay. Your testimony, this is what I was thinking. I was warned. I had some warning. Apparently not all of the warning that I could have been. But this is what I was thinking at the time. Now, is that enough? Do we end in a summary judgment? Or does the case go to the jury? Have the jury decide that fact? Well, Your Honor, summary judgment presupposes a factual issue. The question is, is it disputed? It's not about whether the doctors, whether that was really in the doctor's head is a factual issue. Of course it is. It's the kind of factual issue that jurors analyze in fraud cases, in all kinds of cases where somebody says, this is what I did and this is why I did it. Of course it's a factual issue. But summary judgment is granted on factual issues when they're not disputed. And it simply does not place a person's testimony in dispute that this is what I would have done to say that's unreasonable. I mean, you can imagine a traffic accident case where a plaintiff testifies, he ran the red light and he hit me. You can't use an expert driver to say running a red light is unreasonable. That doesn't dispute that it actually happened. That's the difference between these two kinds of cases. One of them, the medical malpractice case, is all about reasonableness. The doctor's testimony, the expert's testimony is exactly what the point is. But in this case, what the jurors are going to do, if there would be a trial, is they're going to sit and listen to the doctor's testify. And they're going to say, did he really mean, was he being accurate when he said he wouldn't have changed his course? Saying it was unreasonable doesn't make any difference to that. I'm sorry. You seem to be arguing that this case should go to the jury. No. Summary judgment should not stand here. No, I'm not disputing that it's a factual issue. Summary judgment is almost always about factual issues. But you have to place the fact in dispute. The doctor's testimony in this case, both of them, was unequivocal. One of them said, if you told me the risk was 100 percent, I still would have given it to her. A jury can judge that. So to place it in dispute, the plaintiff has to come up with evidence that disputes that unequivocal, unqualified testimony. And somebody, another doctor saying that's unreasonable doesn't contradict that for purposes of summary judgment. At the end of the day, if the doctor gives an affidavit and says, this is what I was thinking, I made this calculus, that's summary judgment right there. That can't be challenged. No, it can be challenged. How? In what way? Well, maybe in other cases he acted differently. Maybe there are things in his notes that say, ah, you know, I was thinking about this. All the ways that there are to challenge the testimony of a witness testifying about his own intent. Maybe he did things. Maybe he talked to another doctor. There are – we are – we lawyers spend our careers disputing the testimony of our opposing counsel's witnesses. The question isn't whether you can dispute the treating doctor's testimony. The question is whether it does dispute it by saying that it's unreasonable. The inference that people don't do things that are unreasonable is just not strong enough. I mean, think about it. We all would be out of a job if that were true. So, counsel, basically you're saying that the doctor said it wouldn't have changed my mind. Right. And for someone to come in and say it should have changed your mind if you knew that, that doesn't dispute it. It doesn't put the truth of it in dispute. It's a different opinion by a different person who says I wouldn't have done that. But it doesn't contradict the person – the treating doctor's testimony about what was in his mind. There are lots of ways to create a disputed issue of fact on that for summary judgment. This just isn't one of those ways. It doesn't contradict it. I want to spend a little time talking about what is not at issue in this case. The adequacy of the warnings is not at issue in this case. Plaintiffs have hypothesized what the warning should have been, but they did not designate an expert below. They would actually need two experts to challenge warning, at least two, one to a medical expert and also an expert on the FDA. Because the court needs to remember that the drug companies, like my clients, don't just put whatever they want in a warning. And so Mr. Lundblad has turned up evidence that some people told Abbott this could be quantified. And bear in mind, Your Honor, and I invite you to take a look at the warnings, which start at page C255 of the common law record. There's a lot of discussion in there about birth, about the risk of birth defects. The only thing that Mr. Lundblad says is missing is a number. But my clients would not have been allowed to just put those numbers in the warning. You have to go to the FDA. You can't put anything in a warning or take anything out of a warning without the FDA approval, unless there's an emergency. And if there's an emergency, you put it in and then you go to the FDA and say, is that okay? So in 2004, the science wasn't there to put these numbers in when this was brought to Abbott's attention. Eventually, I think it got there. But there is no ‑‑ there's nothing in the record on the adequacy of the warning. The question is, if the warning had been different, then would the doctors have changed their testimony? The other thing that's not ‑‑ Isn't the issue is if those warnings have been there, that the standard of care may be accepted, you know, across the entire medical community for doctors that are, you know, treating women of childbearing age, the likelihood of pregnancy, that the standard of care may have been altered or been different across the medical community, if those warnings had been there. Isn't that the issue? No, the issue ‑‑ but that's not the issue in this case, because the question is, would that have changed the doctor's mind? There's no ‑‑ the plaintiff hasn't made a case. Does that get to what's reasonable? I mean, if you have a standard of care based on, you know, this information or that information, you develop a different standard of care. And what has been reasonable for a prescribing physician to do varies based on that standard of care. It would if this were a malpractice case. But this is not. And reasonable is not the issue here. But don't ‑‑ It's whether it happened. But whether it happened or not is based on what was in the doctor's mind, correct? Right, right. And how would they formulate what's in their mind without having all of the information to develop what is in the best interest of their patient? Well, they both testified that they were familiar with the warnings, that they thought about birth defects. So the question here is not ‑‑ The warnings that were there. The warnings that were there, that the FDA had approved. So the issue here is not did we warn about birth defects. We did to great length, and you can see that in the record. The issue here is whether adding numbers to it would have made a difference to their testimony. And that's not about reasonableness. Apparently a jury has already in some way judged that their plan, either their plan wasn't reasonable or they didn't execute it properly. But the question here is not whether it was reasonable. The question is whether that's what they really thought. And, you know, Mr. Lundblad argues in his brief that the learned intermediary rule doesn't apply because the warnings are inadequate. My point is he hasn't made that case, and the warnings were extremely specific about the risk of birth defects. They just didn't have numbers, which really could not ‑‑ and I want the court to understand that my clients could not have just put those numbers in. There's a process. You go to the FDA. If the science isn't there, they won't let you put it in. But, you know, the plaintiff would have to have, I think, two experts to do that. Counsel, is the adequacy of warnings generally a question of fact? It's generally, yes. It's generally a question of expert testimony. So, yes, usually my understanding is in these cases you usually put on a medical expert to say the warning should have said this, and an FDA expert to say if you had told the FDA about this, they would have let you put it in the warning. Or they wouldn't have if you're defending it, I guess. The other issue that is not present in this case is the extensive recitation in the plaintiff's brief of what was basically his recycled cross-examination from the medical malpractice case. What was argued to Judge O'Brien on summary judgment in the circuit court, what was argued to the first district was all about Dr. Nassar, all about that affidavit. Dr. Nassar was never designated as an expert. He was simply attached to their summary judgment response, and it's not enough procedurally either. But whether that cross-examination, so that's not before you. That stuff was not argued either to the appellate court or to Judge O'Brien. What was argued is Dr. Nassar's statement that the doctor's course of action was unreasonable sufficiently placed the issue in dispute, and we submit that it doesn't. As I say, the nub of the case is saying someone, when someone says this is what I did, this is what I thought, saying it's unreasonable doesn't sufficiently dispute that to avoid summary judgment. Of course it's a factual issue. But all they argued was that, and that's not enough. And for that reason, we would ask that the first district be reversed. Thank you very much. Counsel for the appellate. Good morning, Your Honors. May it please the Court. My name is Milo Lundblad, and I represent the plaintiff appellees, in this case the Mohammeds. I would like to just pick up with some, a couple of thoughts that were just presented here. Number one, any argument about the adequacy of the warning is not before this Court. The defendants are the ones that file the motion for summary judgment. They get to choose what issues they wish to raise. They did not raise any issue on whether or not their warning was adequate. They only raised two issues. One is not relevant here. The only relevant issue is whether or not the testimony of the two doctors precludes plaintiff from proving proximate cause. And that's the only issue that's before the Court. This Court, a number of years ago, in Snelson v. Kim, determined that the testimony of a treating doctor is not indisputable when on the issue of proximate cause, if the doctor testifies that he or she would have done nothing different had they been provided more information. And that's the case that we have here. Plaintiff alleges that defendant, in their warnings, failed to provide adequate information, and as a result of that, a different course of action should have been taken had that information been provided. Now, this Court in Snelson relied upon the dissent of Justice Forsyth in the case Seath v. Ingalls Memorial Hospital. And in that case, the issue was whether or not the doctor would have acted differently if he had been told that a baby was in fetal distress and needed to be delivered by a cesarean section. The doctor said, no, I wouldn't have done anything different, even if I knew that. The plaintiff submitted an affidavit of an expert saying any reasonable doctor would have done a C-section at that time. The appellate court majority affirmed the judgment in favor of the hospital, and Justice Forsyth dissented, saying that in a case like this, that it is proper, and it does create an issue of fact if an expert testifies that a reasonable doctor would have done something different. And he made some very good points as to the reasons why this is true. Now, in this case, the testimony of Dr. Sapkansky and Dr. Allen, it was based upon a hypothetical. The question was asked of them, would they have acted any differently if they had known? So they're going back and trying to recreate a situation that occurred 15 years before their depositions and come up with an answer to say, yeah, I wouldn't have changed. Justice Forsyth said that that is speculation, and that it has no... Can I ask you a question? Maybe I missed something. Yes. Is Snelson a medical malpractice case or product liability? No, it's a medical malpractice case. So let's get back to where your opposing counsel stood. Aren't those two different causes of action? Shouldn't we be looking at this and looking at the elements of product liability and analyzing all these issues, looking at cases about product liability, early intermediary and all of that? The answer, I believe, is no. They're the same. The analysis can be the same. And as the appellate court below said, that it's a distinction without a difference. And let me explain the reason why. In all medical decisions, when a doctor is deciding how to treat a patient, that the doctor has to perform and go through a risk-benefit analysis. They have to determine that the benefit of the treatment that they are going to recommend outweighs any risks of injury that might be caused by that treatment. Whether in the instance of Snelson, the issue was whether or not there should have been additional treatment, whether the person should have been kept in the hospital because of complaints of pain that were never transmitted to the doctor. The doctor would have had to do an analysis. If I knew that this person was in pain in a certain area, should I have kept him and done more treatment? It's a risk analysis thing the doctor has to go through. Here it's no different. The doctors in this case were confronted with a patient who was mentally ill, had mood swings, so they had to determine what would be the proper course of treatment. And in this instance, they had two options. Let me stop you there. Back to the legal question. Sure. So you're saying causation in both medical malpractice and product liability is exactly the same analysis. Is that your position? It is because the doctor has to determine that giving a drug the benefit outweighs the risk of harm. Now, certainly we understand in medical malpractice cases we're thinking about standard of care. And certainly that's a big, broad, objective idea. That's why we have experts come in to explain to the jury what the standard of care is. It would seem to me here when we're talking about a cause of action of product liability, that an immediate doctrine has to kick in where we say that Abbott does not have a duty to the patient. However, Abbott has a duty to warn the doctor. It's a much different kind of cause of action, it seems to me. But you're saying the causation piece is exactly the same. That's correct, because in the causation part of it, the doctor has to determine what has to make a risk-benefit analysis. And didn't these doctors testify that they did? Well, that's a good question, Your Honor. Counsel only looks to the first or second deposition the doctors gave. And he says that, you know, in a product case, the issue is determined by what was in the doctor's head. In this case, we don't know what was in the heads of doctors. Do you agree that's the standard that we should be looking at? It's not the standard of care, it's reasonableness, what other experts say. But it's the issue in terms of causation of what did the doctor do with the information that the doctor was given. It's individual doctrine. Do you agree that's what causation is in a product liability? Yes, the issue is what the doctor would have done. However, as Justice Fassard points out, going back and asking the doctor to speculate what he... Was Snelson about the difference between product liability and medical malpractice? It was not. But the analysis is the same, and that is whether or not the risk-reward-benefit would have been altered had that doctor had all the information. And that's what happened here. We contend that the doctors did not have all the information, and if they had, they would have chosen a course of action not to prescribe Depakote to Mrs. Muhammad. And if we look at the two depositions, I would suggest that there is internal contradictions that would create a question of fact for a jury. For example, Dr. Stupansky is the one who determined and started Depakote. And prior to that time, he had gotten advice from a more senior physician, he was only a second-year resident, who said you could use lithium or Depakote. And so he had to make analysis, the risk-reward analysis, which drug would be better, which drug would be safer, and which drug would present the least risk of harm. In 2016, I looked Dr. Stupansky in the eye and said, can you tell me what your thinking was when you made this determination? He says, I don't remember. I asked him point blank, did you consider giving lithium over Depakote? I don't know. I probably would have. Well, can you tell me what your rationale was for choosing Depakote over lithium? I can't tell you. I don't know. Is it stated in your notes what you were thinking? No, it's not. So we don't know what was... But is that the same as the question of would you have done it differently had you known what we know? Well, we're now going back... Is that the same question? But we don't know whether how he reached... We don't know his analysis and how he reached that conclusion in 2005. We're not disputing that the testimony from the doctors was that we would not have done it differently had we known what we know now. That's what they said, yes. But it's our position that that statement, those statements are not credible based on what they testified to, that they can't remember what they were thinking in 2005. And suddenly they decide that they know what they would have done in 2020. So this is really just about what's the standard for summary judgment? Is the statement of someone here on causation, is there a disputed question of fact? The doctor said, I now have been told 11% instead of 2% and I would have made the exact same decision. Is that fact disputed? There is, I think, a fact dispute because we don't know what was in the doctor's head at the time. And the other thing that enters into this case is that neither Dr. Allen or Dr. Stupansky continued down the course of treating patients like Mrs. Muhammad. So as counsel conceded that ultimately this information came out that the risk of Depakote was actually more 17% rather than 2%. May I ask you a legal question more than a fact question? Sure. So in your briefs, you basically say they were not murdered intermediaries. You just say that, right? Correct. Why were they not murdered intermediaries? There's cases that suggest that if a doctor is not provided all the information that's necessary, if the warnings are inadequate, they cannot by definition be alerted intermediary because they don't Are you talking about the Hansen case? No. No? Proctor v. Davis? Well, yes, that's where it was. Yes, that's true. Yes. And isn't it true in that case there were no warnings whatsoever? No warnings given to the doctor. So therefore, because there were no warnings given to the doctor, the court held we can't really say it was a murdered intermediary case because they had no information at all about any problems with the drug, any side effects. And that's what you're relying on, right? To say that we should not apply the murdered intermediary doctrine here. Well, they were not learned intermediaries because they did not have all the information that was necessary. So what case says that they have to have all the information necessary in order to be considered learned intermediaries? What case held that? I believe that Hansen and Proctor do represent that. But putting that aside, it really Hansen held that? Well, in Hansen, there was In Hansen, the issue was whether or not the doctors were sufficiently warned of the harmful effects. Right, which is the same issue here. Were the doctors sufficiently warned of the harmful effects? I'm going to quote Hansen. Hansen says, Baxter gave the medical community no warning at all. And therefore, they were not learned intermediary. It's a much different statement than was there sufficient warning. Would you agree with that? There is a difference in that, but the root is whether or not the warnings provided adequate information, information that was needed for the doctor to make a proper decision. Whether it's none or not enough, I think that that's a distinction without a difference, that if a warning doesn't contain all the necessary information, the doctor is operating in the same vacuum as a doctor who isn't told that the risk or benefit is actually 17% rather than 2%. There are a line of cases that holds that in any situation such as this where a doctor says, I would not have changed my course of action in a product case, that the issue of credibility is always one for the jury to decide. Jury has to decide whether that statement in and of itself should be believed. And what case is that? Those cases are not in Illinois. They're outside cases, Rush v. Wyatt and Goliath. Is this heating cases that you talk about in your brief? Heating? Or is that something else? That's something else. Okay. But here- In your brief, you have some non-Illinois cases that say what you just said. The product liability case where the doctor said additional warnings would not have changed my decision, that those cases have to go to the jury. You're saying that's what other courts have held? Yes. And we're not asking the court to get into the heating argument or because- Your brief does for a couple of pages. Well, it does, but at the end it says the court does not need to decide that. We believe that under Snelson v. Kamm and cases that have followed it, that it is appropriate to create a question of fact and proximate cause through the submission of an affidavit of an expert that says that if the proper warnings had been given, this is what the doctor should have done and it would have been a different course of action. And here, and it goes back again to the rationale that's provided by Justice Fassard, and that is that asking a doctor, in this case 15 years after the fact, to go back and recreate what they were thinking and what they would have done is speculation, particularly since they already testified. They can't remember the circumstances. They can't remember what benefits they were considering and how they were balancing against the risks. So to ask them to go back now and make that analysis is nothing more than speculation, whereas, as Justice Fassard points out, that an expert is looking at the facts and offering an opinion as to what should have been done. And I believe the question was raised whether or not if the information had been properly disclosed in the labeling about the increased risk, whether or not that should have changed the standard of care across the board for all doctors. And we submit that that's what Dr. Nassar's affidavit stands for, that if that information had been out there, then the standard of care would have been that Depakote was improper. And I think we can agree that when Drs. Allen and Stupansky were treating Mrs. Muhammad, they had an obligation to abide by the standard of care. And so if the standard of care says you can't use Depakote in a woman who might become pregnant because the risk is too high, then that should be a matter that the jury should consider in whether or not the statements made by the doctors are believable and credible. I would suggest to you that Dr. Allen's contention that even if he was told that there was 100% probability that Mrs. Muhammad's child would be damaged by Depakote, he would have gone ahead and prescribed it anyway. I mean, that statement, I believe, is totally incredible and not believable, particularly in the context where there was a safer alternative available, lithium. Which wasn't a testimony that lithium, I mean, I'm not a doctor, but I thought the evidence was the doctors knew that lithium had an increased possibility of encouraging suicidal ideation. And this desperately ill, very heartbreaking woman had been shown to have ideations, homicidal ideations, as well as suicidal ideations. And there was testimony, I thought, that lithium could perhaps, that there were indications that lithium could, in fact, play into those kind of ideations. But that's part of the information that the doctors had when they were trying to make these decisions. Well, later on, the doctors, in fact, prescribed lithium. They prescribed lithium starting in, I believe, January, in the middle of her pregnancy, and continued it. After she was pregnant. Yeah, they continued it after her pregnancy and all the way even several years thereafter. So that the, it shows that the, in balancing the equation, that the risk of whatever increase there might be in the risk of suicide was outweighed by the benefit, which would have been the same analysis in May when the deprecate was started. However. Except that, of course, at that time, she was, had a patch of birth control procedures. They were checking her about a week, something like that, to ensure that she continued on birth control. That's not how the facts are on the record. She was on a patch, but she didn't understand how it worked. When she came in in May and they gave her the prescription, she didn't have a gynecologist. She didn't have a prescription to continue filling for the patch. We could talk about that. Right. Thank you, counsel. So the, I'm sorry? Your time is expired. Okay. All right. Thank you. And we believe that the first day strict appellate court decision was properly reasoned and should be affirmed. Thank you. Thank you, Your Honor. I waited a long time in that argument to hear Dr. Nassar mentioned. You only came, Mr. Blundlight only mentioned it at the end. Dr. Nassar is the issue in this case. It's the issue in our PLA, whether Dr. Nassar's affidavit disputes the unqualified testimony. There's nothing about second depositions that were argued to Judge O'Brien or to the First District. It was all about whether Dr. Nassar, by saying that they acted unreasonably sufficiently, disputed their testimony as to what they actually did. That was the only issue on which we raised on summary judgment. We didn't raise the adequacy of the warnings. So that was the only issue that was presented, and we only raised proximate cause. He only responded with Dr. Nassar, and that is the only issue in this case. All these other depositions and who was sure of when, it's not in the case. It's Dr. Nassar. The Snelson case, as the Court pointed out, is a medical malpractice case. In fact, Snelson, a little earlier in the opinion, spends a lot of time talking about what experts do in medical malpractice cases. But Snelson is not a case for proximate cause for all cases. It is to the extent, in fact, it's interesting. The passage Mr. Lundblad relies on where they said, well, the doctor said it wouldn't have changed his mind, you can dispute it, it's dicta. Because at the end of the same paragraph, the Court says, but, of course, we don't have that evidence in this case. They weren't thinking really all the way through because they didn't have a record before them about how it would work in a medical malpractice case. So they certainly weren't thinking about how it would work in the very different product liability failure to warn context. Do you have a case that could illuminate the issue of the differences between medical malpractice and product liability? Our brief is full of those cases, Your Honor. In Illinois? There are some from the appellate court in Illinois, and there are some that take it, refer to it outside the pharmaceutical cases. In fact, there's a discussion in one of the amicus briefs, but also in our case, about failure to read warnings by users outside the product liability case. And they talk about the fact that it is a factual issue, there's no question of it. If you don't dispute it, you get summary judgment granted. But there are lots of cases, and I would also note that there are a lot of cases we cited from all over where summary judgment based on the testimony of treating doctors decides the case. Of course you can try to dispute it, and there are lots of ways to try to dispute it, but it is not some sort of wild or uncommon event that treating physicians testify, and the plaintiffs can't dispute it, and summary judgment is granted. Counsel? Yes, Your Honor. The Hansen case was mentioned, and Chief Justice Tice mentioned the fact that there were no warnings in that case. Right. But in that case, they do note that doctors who have not been sufficiently warned of harmful effects of a drug cannot be considered learned in immediate rights. Right. Where do we go with that? Well, you don't go anywhere in this case, because there isn't any evidence that the warnings were insufficient. And I want to be specific about what the claim is that, because Mr. Lundblad said we didn't have the right percentages. And again, I would encourage the Court to take a look at the warnings. They talk about birth defect risks a lot, and not just spina bifida. They say there's a 1 to 2 percent risk of spina bifida, which is a lot, and everybody agrees that's correct. And then there is a lot of discussion about other birth defects that could be caused that are incompatible with life. No doctor would come away from reading that warning and think, oh, that's not a big deal. It goes on for quite a while in this warning. So the issue really isn't with respect to what's missing in the warning, whether the doctors were adequately warned about the risk of birth defects, even over and above spina bifida, which is the only one that materialized in this case, by the way. That's what the unfortunate young man has. And as you say, it's terrible. But that's the risk that materialized. The other risks didn't materialize, but they were certainly talked about. And the only thing that Mr. Lundblad has ever claimed was missing is to put a number on it. But when you balance the risks, isn't that what you have to look at as the numbers? And when you make a determination, if this risk is worth it in this case, don't you have to look at the level of that risk? Your Honor, you look at it if the science is there. It wasn't in the warning because Abbott left it out. You can't just, you know, somebody, the evidence that Mr. Lundblad has turned up indicates that someone came to Abbott in 2004 and said, hey, we think we can put a number on it. We think it is. Abbott was not free to just take that and put it in the warning. Abbott would have to go to the FDA. We don't think the FDA would have allowed it at the time because the science wasn't there. But to get more specifically to your question, if there's a number that is properly there, you sure would take that into account. But you don't have to. You look at that warning, and if you were a doctor, you would realize if I give this medication to my patient, I am creating a serious risk of birth defects. Just because you don't have a number doesn't mean you don't have enough information to conduct the risk-benefit analysis. And that's what they did in this case. Mrs. Muhammad was a danger to herself and others. She needed something. They looked at lithium. Lithium didn't look like a good prospect. And they felt, unequivocally in their testimony that's in the record in this case, that they could keep her from getting pregnant. In hindsight, maybe either not a good plan or not a plan that they carried out properly because the jury apparently has said that. But if you look at, you know, but none of that places their testimony in dispute. There is no case anywhere that says you can dispute treating physician testimony in a failure-to-warn case, in a products liability failure-to-warn case, by using a medical malpractice expert to give a medical malpractice opinion. Causation is not the same. I understand that pretty much all torts have approximate cause requirement. But in a medical malpractice case, causation is all about expert testimony. In a product liability failure-to-warn, it's all about doctor treating physician testimony. And did they actually think that? If I may just take a last moment or two. Mr. Lundblad sort of concluded by saying that doctors were required to abide by the standard of care. Of course, all doctors are. They were apparently adjudged not to have done so. But that was that case.  Those warnings gave ample evidence to them that there was a possibility of birth defects. Just didn't put a number on it. But did not sugarcoat it, did not downplay it. It's a big part of those warnings. And their testimony that it would not have changed course based on their plan to keep Mrs. Muhammad getting pregnant is simply not disputed by somebody saying that's unreasonable. And if that's what happens in this case, if you can just come in at the last minute with an affidavit, not even an expert designated, and say that's unreasonable, it's going to have, as you say, Justice Tyson, this is a summary judgment case and it's decided as just a summary judgment case, it's going to change, it's going to lower the bar for summary judgment in a way that I don't think you want to do. But if you do want to do it, it should be done in a case where an expert is designated and deposed and not just where he's stapled to the back of a response. For that reason and all of these reasons, we would ask that the court reverse the First District and direct that summary judgment be entered on behalf of my clients. Thank you. Thank you very much. Agenda number 18, number 128841, Charles Muhammad et al. v. Abbott Laboratories, Inc. et al. will be taken under advisory.